**AMERICAN EAGLE FIRE INS. CO. et al.**

v.

**EAGLE STAR INS. CO., Limited.**

No. 13573.

United States Court of Appeals, Ninth Circuit.

June 18, 1954.

As Amended Oct. 21, 1954.

---

Bert W. Levit, Long & Levit, San Francisco, Cal., for appellants.

Joseph J. Geary, Edward D. Ransom, Lillick, Geary, Olson, Adams & Charles, San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and POPE and LEMMON, Circuit Judges.

DENMAN, Chief Judge.

The appellants, hereafter the reinsurers, appeal from a judgment holding them liable to Eagle Star Insurance Co., hereafter the insurer, for the latter's expenditures (a) in attempting to salvage two cargoes of lumber on two barges

towed by a tug, wrecked on the Columbia River bar, as subrogee of the lumber owners by the payment to them of its insurance against such loss and (b) in prosecuting unsuccessfully a libel against the tug and her owners for negligently towing the barges so wrecked.

The reinsurance covered the lumber so to be carried and towed *"at* and from Portland, Oregon to Hawaiian Islands." (emphasis supplied). Its terms, first fixed by telephone and then by a written provisional binder signed by all the reinsurers provided for the rate of premiums to be paid to the reinsurers and contained a warranty provision for the towing as follows: "Warranted Col. River Pilot in charge over Col. River Bar." On January 18, 1947, the barges were wrecked while being towed across the Columbia River Bar without a Columbia River pilot.

The parties are now agreed that at the time of the wreck the breach of the pilotage warranty freed the reinsurers from any liability for the value of the cargo lost on the Bar or for any of the above expenditures. It is apparent that the insurer was liable to the reinsurers for their premiums since their reinsurance covered the risks to the lumber while loading at the Portland quay, shown below in the text of the reinsurance agreement, say by a collision with another vessel while so loading or after loading while waiting for the pilot "at" the Portland quay, causing damage to or loss of the lumber. Hence, the satisfaction of the warranty cannot be considered a condition precedent to existence of the coinsurance.

The reinsurers contend that the court erred in holding that by their conduct after the wreck they created in themselves a new liability for the expenditures in attempting to salvage the cargo and in the unsuccessful libel against the tug and barge. We agree with their contention.

The agreement for reinsurance was orally made on Saturday, January 11, 1947, and was later confirmed by what is called a "provisional binder," a writing signed by the parties. This document was prepared by the insurer and circulated among the reinsurers for their acceptances on January 14, 1947. As prepared by the insurer, the provisional binder, a printed document, filled in by typewriting, reads as follows:

"Reinsurance is Wanted by Talbot, Bird & Co., Inc. as Managers &/or Agents

For account of themselves; loss, if any, payable to said Company, as interest may appear. To be reported as Oregon Business. For, not to exceed, $——— to take part of Approx. $100,000.—Under deck On Rough Lumber valued at ——— Vessel Two Portland Tug & Barge Co. Steel Barges in Tow Tug 'Teton' at and from Portland, Oregon To Hawaiian Islands Subject to the following conditions: FPAEC as Per Original Return for each 30 days (net) L/U

——— Canc. ———

"Including all interior, shore, quay, and other risks covered by the original Policy or Policies.

"In the event of any loss or damage before completion of loading, whether on shore, on craft, or on board the vessel, the liability hereunder shall be in the same measure as it would have been on completion of loading. * * *."

The insurer's original policy in evidence shows it covered the risks at "quay" while loading.

At the insistence of the reinsurers, there was added, in longhand, following the phrase "FPAEC as Per Original," the following warranty for a Columbia River Pilot to be in charge in crossing the Columbia River Bar:

"Towing arrangements approved by Surveyor Webb. Warranted Col. River Pilot in charge over Col. River Bar. Picked Crew."

This provisional binder did not show the amount of insurance in exact terms, this not being known at the time, but did show the rates the insurer was willing to pay. On the reverse side the

reinsurers indicated the proportion of the estimated risk of $100,000.00 each was willing to accept. Such a contract is called "reinsurance bound open for particulars." The evidence revealed that it is the custom of the marine insurance industry to make such contracts when the exact amount of the risk is unknown. All terms other than the amount of risk and the premium thereon are considered as binding upon the execution of the provisional binder.

When the exact amount of the risk is ascertained, so-called "final binders" are executed. The testimony shows that the "risk," or the danger insured against, may not be changed by this final binder although minor variations are permitted in terms in order that the final binder may conform to the facts. Any provision of the provisional binder which is omitted from the final binder does not change the reinsurance contract.

On Saturday, January 18, 1947, the barges were stranded on the Columbia River Bar with no Columbia River pilot in charge. A total loss resulted. The following Tuesday, final binders were sent to each of the reinsurers. These final binders showed the exact value of the cargo as $94,746.00, assigned each reinsurer's share thereof, and computed the premium in accordance with the rates set forth in the provisional binders. Following the words "FPAEC as per Original," the following only was typed: "Towing Arrangements approved by Surveyor Webb." Though the phrase "Warranted Col. River Pilot in charge over Col. River Bar. Picked Crew," which was inserted in longhand in the provisional binder, is not restated in the final binder, it still governed as shown by the above testimony.

The reinsurers at first refused to execute and return the final binders and rejected a tender of premiums, maintaining that they were not liable on the reinsurance contract, apparently then believing that the insurance had never come into existence because of the warranty. A series of conferences was held during which the insurer contended that the reinsurers were legally liable and even if not, they should as a matter of comity between insurers and reinsurers pay their share of the loss because the insurer (who was not protected by a bar pilot warranty) had been required to pay the entire loss. During this period, a settlement of $25,000.00 was offered by the reinsurers and rejected.

In November of 1947, a meeting of the reinsurers was held at which it was determined to pay the insurer for the cargo loss, to accept the premiums, and to execute the final binders. A suit had then been brought by the insurer against the tug and its owner for the recovery of the expenditures here sued for, which if successful would have reimbursed the reinsurers. It later proved to be unsuccessful.

A letter was drafted at this November meeting which accompanied the drafts or payment orders sent by each of the reinsurers to the insurer. These November letters, signed by each reinsurer, required the insurer to continue to press the suit against the tug and owners. They read:

"Talbot, Bird & Co., Inc.
"114 Sansome Street
"San Francisco, California
    "Re: Barges No. 1684 and No. 1685 in tow tug 'Teton.'
"Gentlemen:
    "For reasons that have ben explained to you during various meetings in connection with the above losses, we hold the opinion that there is *no legal basis for assumption of liability* under your proposals for reinsurance on the lumber cargoes.

    "However, and *without prejudice*, we have determined to advance the proportion of the amount you claim with respect to the physical loss, which according to your debit notes amounted to $81,212.44. It is understood that you, as direct underwriter, *will continue your action under subrogation* and keep us advised of all important developments.

"As to the legal and other expenses, we shall consider them *when the case is finally concluded.* It is obvious to us that a substantial expense has been incurred to date and you may reach a point, taking into consideration offers of settlement, at which it would be advisable to analyze the economy of further continuance of litigation or preparation therefor.

"In the maintenance of our position as outlined herein, we shall accept, *also without prejudice,* the payment of the premium which you have heretofore tendered.

"Yours very truly,"

(Emphasis supplied.)

The language of the payment drafts varied, but each stated it was "in full settlement" of the "total loss" insured by the payor.

The insurer contends that this payment transaction constitutes a waiver of the bar pilot warranty. In interpreting the letter, the court held that the words "without prejudice" meant that the reinsurers were not setting a precedent which would bind them in cases of future reinsurances and that the word "advance" meant that the ultimate extent of the reinsurers' liability was not satisfied by the payment; the words "in full settlement" used in the payment drafts were held to mean only full settlement of the cargo loss and not to refer to the reinsurers' complete obligation to the insurer; and the acceptance of the premiums and the execution of the final binders were held to constitute new reinsurance agreements *retroactive* to January, 1947, without the bar pilot warranties.

■ The case below was tried by a successor judge who did not hear the testimony. Where the evidence is largely documentary and the testimony, as if in depositions, is not heard by the trial judge, a court of appeals is free to draw its own inferences and is not bound by those drawn by the trial judge. Smyth v. Barneson, 9 Cir., 181 F.2d 143, 144 (documentary evidence); Pacific Portland Cement Co. v. Food Machinery &

Chemical Corp., 9 Cir., 178 F.2d 541, 548 (documentary evidence); Murphey v. United States, 9 Cir., 179 F.2d 743, 745 (depositions); United States v. El-O-Pathic Pharmacy, 9 Cir., 192 F.2d 62, 66 (testimony not heard by trial judge).

■ Since at the time the loss occurred, the reinsurers had no liability on their insurance and were entitled to their premiums, the consideration for such new reinsurances in November for the then known total loss of the lumber in the previous January plus the expenses of the attempted salvage and the pending litigation would have to be new premiums, which obviously would be premiums equal to the total loss and salvage and litigation expense. We can find no consideration at all for such new insurance.

There is no merit in the contention that the phrase "without prejudice" applies to future contracts between the insurer and the reinsurers since it obviously could not affect them. We construe the phrase to apply to the voluntary payment of the value of the lost lumber for which the reinsurers hoped to be reimbursed by the pending suit by the insurer against the tug and owner—that is to say, the payments were "without prejudice" as to any further liability of the reinsurers. The word "advance" is controlled by the words "without prejudice" and means that the voluntary payment for the lost lumber is not an admission of further liability. The words "in full settlement" mean such settlement of any liability upon the reinsurance agreements.

The judgment on the complaint is reversed and judgment thereon ordered entered by the district court for the reinsurers.

■ The reinsurers also appealed from a judgment for the insurer on their cross-complaint which the parties are agreed presents different issues on the appeal from those of the appeal on the complaint. These different issues were not presented to us in the briefs on appeal of the reinsurers. They explain in a footnote to one of their briefs that they

do not discuss these issues because it would be unnecessary if the decision on the complaint were affirmed. It was obvious that the decision on the complaint could be reversed, as it was. In effect, the reinsurers are asking us now to treat the appeal on the cross-complaint as if they had just taken it, on which they may now file their opening brief, which the insurer must answer, with a likely reply and an argument to this court, to which the insurer is entitled and which we deem advisable. We see no reason for such an imposition on the insurer and on this court. The judgment on the cross-complaint is affirmed.