Dr. Robert E. WHITING, Ph.D., Plaintiff-Appellee Cross Appellant,

v.

JACKSON STATE UNIVERSITY and John A. Peoples, Individually and in his capacity as President of Jackson State University, Defendants-Appellants Cross Appellees.

No. 78–1338.

United States Court of Appeals, Fifth Circuit.

April 28, 1980.

Ed Davis Noble, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants-appellants cross appellees.

James G. McIntyre, Jackson, Miss., for plaintiff-appellee cross appellant.

Before COLEMAN, Chief Judge, REAVLEY and ANDERSON, Circuit Judges.

REAVLEY, Circuit Judge:

Appellee, Dr. Robert Whiting, won a judgment in the district court for back pay, interest, and attorney's fee and costs. Our examination of the record convinces us that

sufficient evidence was adduced to warrant jury submission on Whiting's statutory claims of racial discrimination in employment. However, we find that the district court failed to articulate its reasons for the amount of the attorney's fee award as required by our previous holdings. Consequently, we affirm the award of the back pay, interest and costs, but remand to the lower court for a reconsideration of the attorney's fee award pursuant to the appropriate factors.

Whiting, a white person, was hired as a psychometrist by Jackson State University ("JSU"), a predominantly black, state-supported institution after receiving his Ph.D. in educational psychology. He commenced employment under a one year written contract in the Psychometry Department in August of 1974. The Psychometry Department is, in turn, one component of Student Counseling Services at JSU. His annual contract was renewed the following year; however, Dr. John Peoples, president of JSU, notified Whiting by letter that he was being suspended without pay as a January 23, 1976, and that JSU did not intend to renew his contract.

Whiting subsequently filed this suit in the district court alleging that he was the target of a racially discriminatory discharge. He sought relief pursuant to 42 U.S.C. §§ 1981, 1983 (1976), and section 706 of Title VII, 42 U.S.C. § 2000e–5 (1976), against JSU and Dr. Peoples.[1] Whiting prayed for compensatory and punitive damages, back pay, other allowances and privileges which were denied him by the actions of JSU, costs and an attorney's fee.

At the close of Whiting's case, JSU's motion for a directed verdict was denied. The jury returned a verdict in favor of Whiting for unpaid salary with interest, a reasonable attorney's fee, and costs. JSU's subsequent motion for a judgment n. o. v. was denied. The district court then entered final judgment on the jury verdict. It awarded $8,400 in unpaid salary,[2] $1,397.76 interest, an attorney's fee of $3,000, and costs.

JSU prosecutes this appeal urging that the trial court erred in denying its motions for a directed verdict and a judgment n. o. v. because the evidence was insufficient to warrant jury submission. It also argues that the attorney's fee award is improper because Whiting should not have prevailed on the evidence educed. Whiting cross-appeals on the basis that the trial court misstepped by not instructing the jury that it could award further equitable relief, viz: reinstatement, and compensatory as well as punitive damages. He does not assert that the trial court erred in not awarding reinstatement. Whiting also complains that the attorney's fee award is parsimonious.

## I.  BASES FOR RELIEF

### A.  *Section 706 of Title VII*

■ The plaintiff in a section 706 suit, such as this, must carry the initial burden of establishing a prima facie case of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 32 L.Ed.2d 668 (1973). Although *Green* was a hiring case, its four factors for establishing a prima facie case have recently been extended to discharge situations by this circuit. *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563 (5th Cir. 1979); *Marks v. Prattco, Inc.*, 607 F.2d

1. Hereinafter, unless the context indicates to the contrary, we will use "JSU" to designate both JSU and Dr. Peoples since, for purposes of this appeal, their interests are identical.

2. Although the judgment does not refer to the $8,400 as back pay, it states that it is a favorable ruling on Whiting's motion to assess "damages" based upon the jury verdict. That motion requested "damages" in the amount of unpaid salary. Whiting testified that his annual salary was $16,800.00 under his one-year agreement with JSU. Since he was terminated

about midway through the contract period, the award approximates the back pay due for the remainder of the agreement. It is also clear that the award is not traditional compensatory damages because Whiting cross-appeals from the trial court's refusal to instruct the jury that it could award compensatory and punitive damages. *See generally Kingsville Indep. School Dist. v. Cooper*, 611 F.2d 1109 (5th Cir. 1980) (back pay mischaracterized as "damages" by the district court).

1153 (5th Cir. 1979). The plaintiff must show that (1) he belongs to a group protected by the statute; (2) he was qualified for the job from which he was suspended and not rehired; (3) he was terminated; and (4) after his termination, the employer hired a person not in plaintiff's protected class, or retained those, having comparable or lesser qualifications, not in plaintiff's protected class. *See Green*, 411 U.S. at 802, 93 S.Ct. at 1824. An unanswered *Green* prima facie showing results in an inference of discriminatory animus in these disparate treatment cases. *Furnco Constructions Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978).

■ Once the plaintiff has established a prima facie case, the employer must articulate some legitimate, nondiscriminatory reason for the termination. *Board of Trustees v. Sweeny*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Waters*, 438 U.S. at 577–78, 98 S.Ct. at 2949–50 (1978); *Green*, 411 U.S. at 802, 93 S.Ct. at 1824. *Burdine*, 608 F.2d at 567, establishes that we require the employer to prove nondiscriminatory reasons for the discharge by a preponderance of the evidence. The employer is not required to prove absence of a discriminatory motive. *Sweeny*, 439 U.S. at 25, 99 S.Ct. at 295.

■■ If the employer effectively rebuts the plaintiff's charge, the plaintiff must be afforded a fair opportunity to establish that the employer's asserted justification is, in fact, a ruse for a racially discriminatory decision. *Green*, 411 U.S. at 804, 805, 807, 93 S.Ct. at 1825, 1826. However, Title VII is not violated simply because an impermissible factor plays *some* part in the employer's decision. The forbidden taint need not be the sole basis for the action to warrant relief, but it must be a *significant* factor. *Garcia v. Gloor*, 609 F.2d 156, 160 (5th Cir. 1980).

■ Ultimately, the burden of persuasion rests on the plaintiff, who must establish the statutory violation by a preponderance of the evidence. *Jepsen v. Florida Board of Regents*, 610 F.2d 1379, 1382 (5th Cir. 1980); *Causey v. Ford Motor Co.*, 516 F.2d 416, 420 n.6 (5th Cir. 1975). If this burden is met, our traditional reticence to intervene in university affairs cannot be allowed to undermine our statutory duty to remedy the wrong. *Jepsen*, 610 F.2d at 1383.

### B. *42 U.S.C. § 1981*

When section 1981 is used as a parallel basis for relief with section 706 of Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706. *Garcia*, 609 F.2d at 164; *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979); *see also Johnson v. Alexander*, 572 F.2d 1219, 1223 n.3 (and cases cited therein) (8th Cir. 1978), *cert. denied*, 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978).

■ There is no question that under section 1981, the plaintiff must establish purposeful discrimination equivalent to that required by those alleging fourteenth amendment dereliction. *Grigsby v. North Miss. Medical Center, Inc.*, 586 F.2d 457, 460–61 (5th Cir. 1978); *Williams v. DeKalb County*, 582 F.2d 2 (5th Cir. 1978). But when section 1981 is merely used as a companion remedy provision to section 706, we hold that such intent should be inferred in the same manner as *Waters* said it is inferred under section 706.

### C. *42 U.S.C. § 1983*

■ Section 1983 serves as a basis for relief for violations of federal law under color of state law. Insofar as it is used as a parallel remedy for transgression of section 1981 and section 706 of Title VII rights, the elements of the causes of action do not differ from those discussed above. The only other federal law that Whiting suggests has been trammeled by JSU's actions is the fourteenth amendment. Despite JSU's interpretation, we do not understand Whiting to complain that he was denied procedural due process. Rather, he claims his termination on racial grounds offends equal protection.

No person may be suspended without pay and refused contract renewal for constitutionally impermissible reasons. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Carmichael v. Chambers County Board of Education*, 581 F.2d 95, 97 (5th Cir. 1978). Race, of course, cannot constitutionally serve as the motivating factor for the decision. U.S.Const., amend. XIV; *see Lee v. Macon County Board of Education*, 453 F.2d 1104 (5th Cir. 1971); *Knowles v. Board of Public Instruction of Leon County, Florida*, 405 F.2d 1206 (5th Cir. 1969).

In order to establish a violation of the equal protection clause, the plaintiff must prove a racially discriminatory purpose or motive. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 256, 97 S.Ct. 555, 558, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Nevett v. Sides*, 571 F.2d 209, 217–18 (5th Cir. 1978), *petition for cert. filed*, 48 U.S.L.W. 3087 (U.S. Aug. 21, 1979) (No. 78–492). If the plaintiff shows that race was a substantial or motivating factor in the decision to terminate him, the burden shifts to the defendant to show by a preponderance of the evidence that it would have reached the same result even in the absence of the reprobated factor. *Mt. Healthy School District Board of Education v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

## II. REVIEW OF THE JURY AWARD OF EQUITABLE RELIEF

Whiting's complaint requested both compensatory and punitive damages in addition to his request for equitable relief.[3] Damages were cognizable at law so the trial court properly placed the case on its jury docket.[4] However, we are informed by

3. A claim for back pay under section 706 of Title VII is equitable rather than legal in nature. *United States v. U. S. Steel Corp.*, 520 F.2d 1043, 1060 n.1 (5th Cir. 1975), *cert. denied*, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Johnson v. Georgia Highway Express*, 417 F.2d 1122, 1125 (5th Cir. 1969). A similar result has been reached when the request for back pay was brought pursuant to 42 U.S.C. § 1981 (1976). *Lynch v. Pan Am. World Airways*, 475 F.2d 764, 765 (5th Cir. 1973). *Cf. Blum*, 597 F.2d at 938 (jury request properly denied in suit brought pursuant to section 1981 and section 706 of Title VII). In appropriate cases, back pay is awardable under section 1983, *Moore v. Tangipahoa Parish School Board*, 594 F.2d 489, 494–95 (5th Cir. 1979). The equitable character of the relief does not change simply because it is sought pursuant to section 1983. *Harkless v. Sweeny Ind. School Dist.*, 427 F.2d 319, 323–24 (5th Cir. 1970), *cert. denied*, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971).

To the extent the complaint sought reinstatement and other concomitants of employment under Title VII, they would have to be authorized by 42 U.S.C. § 2000e–5(g) (1976), which provides for reinstatement and "other equitable relief as the court deems appropriate." *See Great American Federal Savings & Loan v. Novotny*, 442 U.S. 366, 373, 99 S.Ct. 2345, 2350, 60 L.Ed.2d 957 (1979) (section 706 only expressly authorizes equitable relief). An order of restoration of lost benefits is equitable because it is in the nature of an injunction. No chameleon-like change in the nature of the relief is experienced simply because it is sought under sister provisions in the federal statutes.

Perhaps it is not entirely accurate to label attorney's fees and costs as either equitable or legal. However, their inclusion does not raise the right to a jury in an otherwise purely equitable action. Both statutes relied upon by Whiting for an attorney's fee provide that it is to be awarded by the court. 20 U.S.C. § 1617 (1976); 42 U.S.C. §§ 2000e–5(k) (1976). Such statutes do not offend the seventh amendment. *Spach v. Monarch Ins. Co.*, 309 F.2d 949, 953 (5th Cir. 1962). Costs are usually awarded as a matter of course in civil proceedings in the federal courts. Fed.R.Civ.P. 54(d).

4. While this circuit has not yet decided whether actual or punitive damages are recoverable under Title VII, *cf., Claiborne v. Illinois Central R. R.*, 583 F.2d 143, 153–54 (5th Cir. 1978), *cert. denied*, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979) (punitive damages); *Smith v. Liberty Mutual Ins. Co.*, 569 F.2d 325, 329 n.6 (5th Cir. 1978) (punitive damages), other courts have found that they are not recoverable. *Pearson v. Western Electric Co.*, 542 F.2d 1150, 1151 (10th Cir. 1976); *White v. North Louisiana Corp.*, 468 F.Supp. 1347, 1353 (W.D.La. 1979); *Curran v. Portland Superior School Committee*, 435 F.Supp. 1063, 1078 (and cases cited therein) (D.Maine 1977). Other cases that only address the question of compensatory damages, hold that they are not recoverable. *Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192, 197 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979); *Wright v. St. John's Hospital*, 414 F.Supp. 1202, 1208 (N.D.Okl.1976); *Tooles v.*

Whiting in his cross-appeal that the lower court did not instruct the jury that it could award compensatory and punitive damages. Rather, only the request for equitable relief was submitted to the jury and it was submitted without objection by either side.[5]

■ This submission triggered Fed.R. Civ.P. 39(c). By failing to object, the parties agreed that the jury's verdict on the claims for equitable relief was to have the same effect as if a right to a jury trial existed. *Stockton v. Altman*, 432 F.2d 946, 949–50 (5th Cir. 1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971); *Kelly v. Shamrock Oil & Gas Corp.*, 171 F.2d 909, 911 (5th Cir. 1948), *cert. denied*, 337 U.S. 917, 69 S.Ct. 1159, 93 L.Ed. 1727 (1949). From this fact two propositions follow. First, the trial judge was not required to make findings of fact per Fed.R.Civ.P. 52(a) to support the judgment as is the case when a jury is utilized in an advisory capacity. *Security Mutual Casualty Co. v. Affiliated FM Insurance Co.*, 471 F.2d 238, 245 (8th Cir. 1972); *Kelley*, 171 F.2d at 911. Second, the only issue for us on review of denial of motions for a directed verdict and a judgment n. o. v. is the sufficiency of the evidence under the litmus of *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969). Fed.R.Civ.P. 39(c); *Security Mutual Cas. Co.*, 471 F.2d at 245.

■ Since its formulation, we have not wavered from the test for reviewing the propriety of denials of motions for directed verdicts and judgments n. o. v. announced in *Shipman*. *E. g., Bauman v. Centex*

Corp., 611 F.2d 1115, 1119 n.3 (5th Cir. 1980). We look to all the evidence, in the light most favorable to the nonmovant and with all inferences drawn in favor of that party. Provided that evidence of such quality and weight is educed that reasonable and fair-minded men in the exercise of impartial judgment could reach differing conclusions, the motions must be denied. *Shipman*, 411 F.2d at 374. The fact finding power which belongs to the jury includes the drawing and rejecting of inferences from the facts. *E. g., Johnson v. William C. Ellis & Sons Iron Works*, 604 F.2d 950, 958 (5th Cir. 1979).

### A. The Prima Facie Case

■ Whiting succeeded in producing sufficient evidence at trial to establish a prima facie case under all three bases for relief. With an eye towards the *Green* paradigm, Whiting established each element. First, he was in a racial minority at JSU and race is an impermissible employment consideration. Second, no one has contended that Whiting was not fully qualified for his position. In fact, Dr. Brooks, a black person and former Dean of Counseling Services at JSU, testified that he wrote a letter of recommendation for Whiting, in his quest to become a licensed psychologist, based upon Whiting's performance at JSU. Third, termination is obvious.[6]

With respect to the final *Green* factor, there is evidence that JSU not only retained black individuals with comparable or lesser

---

Kellogg Co., 336 F.Supp. 14, 18 (D.Neb.1972). Most courts have denied recovery of punitive damages. *Richerson v. Jones*, 551 F.2d 918, 926–28 (3rd Cir. 1977); *Russell v. American Tobacco Co.*, 528 F.2d 357, 366 (4th Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976); *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 308–10 (6th Cir. 1975); *vacated on other grounds sub nom. Utility Workers Union of America v. EEOC*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977).

We have held, however, that both compensatory damages, *Garner v. Giarrusso*, 571 F.2d 1330, 1338 (5th Cir. 1978), and punitive damages, *Claiborne*, 583 F.2d at 153–54, may be awarded under section 1981. A similar result has been reached with respect to section 1983.

*Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (compensatory damages); *Mansell v. Saunders*, 372 F.2d 573, 576 (5th Cir. 1967) (punitive damages).

5. Because the jury charge is not included in the record on appeal, we are uncertain which remedies were submitted to the jury. However, Whiting's objection on appeal to the fact that the trial court failed to instruct on compensatory and punitive damages indicates that these were not submitted.

6. JSU seeks to distinguish discharge from suspension without pay and failure to renew an employment contract. On these facts they are functional equivalents.

qualifications but actually promoted them to positions superior to that held by Whiting. Dr. Allen, a black person, was promoted from Coordinator of Counseling Services to Associate Dean for Counseling Services. From that position she was promoted to Dean of Counseling Services, a position superior to Whiting's. Both promotions came within five months after she received her Ed.D. according to Allen's own testimony. However, the evidence is uncontroverted that Allen did not hold an Ed.D. when Whiting joined the JSU staff; she had yet to complete her dissertation. Whiting also testified that before coming to JSU, he had been promised that he would become Director of the Department of Psychometry when the then present director retired. Instead, the position was given to Dr. Crockett, a black individual, shortly after Crockett received his Ph.D. Like Allen, Crockett did not hold a doctoral degree when Whiting joined JSU; he had not yet written his dissertation.

Peoples, Crockett and Allen all testified that the latter two were more qualified for their promotions than Whiting. Their view was that extra experience working at JSU more than compensated for the superior degree. But Whiting offered offered disputed testimony that both Crockett and Allen spent significant amounts of time working on their dissertations rather than performing assigned tasks during his tenure at JSU. Moreover, Whiting's qualifications displayed a background in counseling with both academic and practical experience. Whiting further testified that he had ample experience testing both children and university students. In addition, Whiting, Dr. Dunn, and Dr. Crider all testified that one with a Ph.D. is to be considered more generally qualified than one who possesses a masters degree.

Based on the totality of the evidence, we conclude that Whiting established a prima facie case under section 706 of Title VII and 42 U.S.C. § 1981 (1976). Moreover, this evidence, in combination with that recited below, would permit the inference that race was an unconstitutionally motivating factor in the discharge. Consequently, section 1983 relief for an equal protection violation is appropriate unless JSU established that Whiting would have been fired even absent racial motives.

### B. The Rebuttal

JSU has offered several justifications for the discharge. Dr. People's letter of "suspension" charged Whiting with: (1) consistently refusing to carry out assigned duties; (2) being extremely uncooperative in his relationship with colleagues; (3) using his university office to transact a private aviation business; and (4) illegally charging JSU with over $300 in private telephone calls related to his purported business.

Testimony was presented at trial in support of all of these allegations. For instance, in regard to the first two complaints, Dr. Peoples testified that Whiting came to work late and left early on several occasions and spent too much time on his personal aviation business when he should have been working with students. Peoples also testified that he received reports that Whiting was testy with secretaries who refused to make or take calls relating to his aviation business. He stated that Whiting also refused to desist from trading aircraft when requested to do so by his superiors. Whiting challenged this testimony and claimed that he carried out all assigned tasks and initiated others on his own. He denied having an uncooperative attitude.

In reference to the latter two charges, both Peoples and Crockett stated that Whiting spent excessive periods of time on the telephone transacting business for a private aviation enterprise during business hours. This allegedly tied up the telephone lines for long periods. Moreover, many of the calls were long distance. Peoples and Allen stated that the bill for Whiting's long distance personal calls amounted to over $300. The debt was initially billed to JSU.

Whiting admitted trading aircraft while at JSU but stated that it could not be considered a business. He said he traded only eight to ten aircraft in the period 1974

through 1976. However, he remained at JSU only sixteen and one-half months during that interval and his 1975 tax return declared no income from the trading of aircraft. Whiting claimed that he traded only a few aircraft while at JSU, and he stated that other pilots at JSU may have been responsible for some of the calls to Mena, Arkansas, a city known for its active aircraft trading market.

Whiting similarly admitted making long distance personal phone calls. However, he stated that several of the calls were related to his attempt to establish an aeronautical science program at JSU. Peoples conceded that Whiting had approached him with the proposal and that it had interested him, but he claimed Whiting had no authority to make the calls without Peoples' express permission.

Moreover, both Whiting and Peoples testified that the JSU handbook does not forbid personal phone calls; it only requires that the person using the telephone must pay for the call. Whiting testified that he paid for all the calls that were identified as belonging to him. He also said he offered to pay for the unclaimed calls on the JSU bill. Both Peoples and Allen agreed that Whiting had offered to pay for some calls. However, they felt his share was more than the sum he offered. Allen admitted that some of the calls that remained unaccounted for could have been made or received by others. Moreover, at one point, Peoples stated that the telephone bill was a subsidiary factor in his discharge decision; he claimed the primary factor was that Whiting was not doing his job.

Although not mentioned in the suspension letter, JSU also points out that Whiting left the campus during the Christmas break in December of 1975 and failed to return on the appointed date. Peoples claimed that at no time prior to the middle of the second week in January did Whiting contact anyone at JSU regarding any injury that he had sustained or concerning the reason he failed to return, despite the fact that Whiting was due back at an earlier date.

Whiting, on the other hand, testified that he injured his back while performing menial tasks immediately prior to the holidays. He admitted that he did not notify his immediate superior, Crockett, of the injury at that time as required by the JSU handbook; he claimed that Crockett had already left the institution. According to Whiting, however, he did notify Crockett's friend, Jefferson, that his back was giving him trouble. Whiting further stated that he later informed Crockett of the injury by telephone.

Whiting's account of the events surrounding his failure to return to JSU also differed from Peoples' version. He claimed that he visited his family physician, Dr. Meck, while he was in Florida over the holidays. Meck admonished him to rest his back. When Whiting returned to Jackson, Mississippi, he saw two other physicians, Dr. Spell and Dr. Truett, and they echoed the prescribed rest period. Whiting admitted that he did not notify anyone at JSU that he needed to rest his back until after he was examined by Dr. Spell. This occurred on January 13, 1976. But the jury could have synthesized all the testimony and concluded that JSU was aware of Whiting's injury and the reason he failed to return.

We do not suggest that the reasons for discharge expressed in People's letter or Whiting's failure to notify JSU of his injury or his intent not to return on the first business day that followed the holidays is not cause for dismissal. We only hold that based on the foregoing testimony, the jury could have inferred that the proffered reasons were mere pretext for a discriminatory discharge.

### C. *Other Evidence of Pretext*

This was not the only evidence before the jury which might lead reasonable men to conclude that Whiting's race was the real motive behind the discharge.

Neither side disputes the fact that Whiting wrote a proposal for a lab using biofeedback methodology in an attempt to attract another $1,000,000 in federal funds to

JSU. While Peoples and Whiting disagreed about how instrumental Whiting's proposal was in obtaining the grant, the jury could have believed Whiting's assertion that his proposal directly resulted in the grant. Whiting testified that it is customary in academic circles to award the directorship of a program, which is precipitated by a proposal, to the person who authors the proposal. Nevertheless, the directorship of the lab went to a black person, Mrs. Clayton.

When Allen became Dean of Counseling Services, she had all of the Advanced Institutional Development Program (AIDP) material removed from Whiting's office, according to Whiting. This, he claimed, left him in limbo because he had been hired to direct the student component of AIDP. Allen related a different version; she testified that she did not remove the material but only sought data from Whiting to make monthly reports and site visitor reports.

There was also some evidence, albeit disputed, that Whiting was given an inferior office and substandard furniture when the Psychometry Department moved from the Administrative Tower into Green Hall. He testified that his black counterparts enjoyed much better facilities. He also testified that, unlike black members of the department, he was relegated to performing menial, manual labor after the move. It was during the course of performing these tasks that Whiting claims he was injured. Subsequent to his termination, Whiting averred that his attempts to secure a hearing proved fruitless when JSU personnel failed to return his calls.

We do not suggest that Whiting's case is compelling. But our reading of the record has convinced us that he met his burden of initially establishing a constitutional and statutory violation. Thereafter, reasonable minds could differ regarding (1) whether JSU rebutted the initial showing; (2) whether JSU established that Whiting would have been discharged even absent racial consciousness, or (3) whether Whiting

substantiated his theory that the proffered justifications were pretext. Once we have made this determination, our review of the denial of the motions for a directed verdict and a judgment n. o. v. is at an end.

### III. ATTORNEY'S FEE

We reject JSU's contention that no attorney's fee should have been awarded because Whiting should not have prevailed. Our review of the evidence demonstrates that there was sufficient evidence to warrant a jury submission.

Whiting's cross-appeal urges that the $3,000 attorney's fee award is penurious. We are unable to review the award effectively because the trial court gave no reasons justifying it as required by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). This court has consistently held that when the award is unaccompanied by some indication that the trial court has given due consideration to the twelve *Johnson* factors, we must remand for a reconsideration in light of these factors. *E. g., Gay*, 608 F.2d at 128; *Davis v. Fletcher*, 598 F.2d 469 (5th Cir. 1979). On remand the district judge should carefully consider each element and clearly articulate his reasons for making the award.

### IV. FAILURE TO CHARGE THE JURY

We must also reject Whiting's argument that the trial court erred by failing to instruct the jury regarding compensatory and punitive damages as well as reinstatement. The record on appeal is devoid of any objections to the jury instructions.[7] If no objection was raised to the jury charge in the trial court, we cannot consider it on appeal, Fed.R.Civ.P. 51, unless the error is so fundamental as to result in a miscarriage of justice. *Patton v. Archer*, 590 F.2d 1319, 1322 (5th Cir. 1979). After reviewing the record we cannot say that such an exceptional case is before us. Even if an objection was made, it does not appear in the record on appeal; we cannot review

---

**7.** At oral argument, Whiting's counsel, who also represented him in the trial court, stated

that he thought he made an objection but he could not recall with certainty.

it. *Ramsey v. United Mine Workers,* 401 U.S. 302, 312, 91 S.Ct. 658, 664, 28 L.Ed.2d 64 (1971); *King v. Ford Motor Co.,* 597 F.2d 436, 440 n. 3 (5th Cir. 1979). The burden was on Whiting to insure that all of his objections were made part of the record. Fed.R.App.P. 10(b) and (c).

For the foregoing reasons we affirm the district court's judgment in part and remand for a reconsideration of the attorney's fee award and an articulation of reasons supporting it.[8]

AFFIRMED IN PART AND REMANDED.

---

**8.** Although neither Peoples nor JSU has raised the bar of the eleventh amendment, we consider it *sua sponte* because a defense based upon the eleventh amendment is in the nature of a jurisdictional bar. *Edelman v. Jordan,* 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974).

The 1972 amendments to Title VII altered the definition of "person" in § 701(a) of the Equal Employment Opportunity Act, 42 U.S.C. § 2000e(a), to provide that "governments, governmental agencies, [and] political subdivisions" are included within that term. For the first time, state and local governments, and their agencies, had to abide by the statute. JSU is an agency of the state because it is a state-created political body, Miss.Code Ann. § 37 125-1 (Cum.Supp.1979), and receives state funding. *See Henry v. Link,* 408 F.Supp. 1204, 1207 (D.N.D.1976), *mod. on other grounds,* 417 F.Supp. 360 (D.N.D.1976). Sub-

sequently, in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court held that the 1972 amendments were Congressional action intended to pierce the eleventh amendment veil and thus surmount its barrier. We note that (1) sections 706(g) and (k), 42 U.S.C. §§ 2000e–5(g) and (k) (1976), expressly provide that a plaintiff in a section 706 action may recover back pay, costs, and attorneys' fees; and (2) we have already held that interest is properly awarded on back pay. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 263 (5th Cir. 1974), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

Since Whiting produced sufficient evidence to warrant jury submission on his Title VII claim, no eleventh amendment bar precludes the monetary relief in this case. Consequently, we need not examine the effect of the amendment on his other statutory bases for relief.