**Margie Louise HERRIN**

v.

**NEWTON CENTRAL APPRAISAL DISTRICT, Mary Lee Cliburn, Wanda Thompson, Geraldine Kerr.**

**Civ. A. No. B–86–1411–CA.**

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 23, 1987.

---

**53.** *Brunswick Corporation v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

A.W. Davis, Jr., Newton, Tex., J. Joe Harris, Matthew & Branscomb, San Antonio, Tex., for plaintiff.

John H. Seale, Seale, Stover, Coffield, Gatlin & Bisbey, Jasper, Tex., for defendant.

## MEMORANDUM OPINION

COBB, District Judge.

The court, having conducted a full and complete bench trial in the above referenced matter, is called upon to decide the claim of Margie Louise Herrin ("Herrin"). Herrin advances essentially three conten-

tions. First, the Newton Central Appraisal District ("the District")—acting through three out of five board members, Mary Lee Cliburn ("Cliburn"), Wanda Thompson ("Thompson"), and Geraldine Kerr ("Kerr") —denied her a promotion to the position of Chief Appraiser for the District, because she was pregnant. Second, the District— acting through Cliburn, Thompson, and Kerr—constructively discharged her from her position as Chief Deputy Appraiser for the District, because she was pregnant. Third, the District's decision to not promote Herrin and the constructive discharge of Herrin violated her rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment, entitling her to relief pursuant to Title 42 U.S.C. § 1983, and the Commission on Human Rights Act, TEX. LABOR CODE ANN. § 5221K (Vernon 1987).

Before articulating Findings of Fact and Conclusions of Law, the court deems it prudent to set forth basic prima facie burden of proof rules which it followed in evaluating the evidence set forth at trial.

### PRIMA FACIE BURDEN OF PROOF RULES

In general, to establish a violation of the Equal Protection Clause, the plaintiff must prove by a preponderance of the evidence that a gender-based discriminatory purpose or motive was a substantial or motivating factor in the decision not to promote, or in the creation of circumstances constituting the constructive discharge. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 256, 97 S.Ct. 555, 558, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Whiting v. Jackson State University*, 616 F.2d 116, 122 (5th Cir.1980); *Nevett v. Sides*, 571 F.2d 209, 217–18 (5th Cir.1978), *cert. denied*, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980). As in any equal protection case, the burden is, of course, on the plaintiff to prove the existence of purposeful invidious discrimination. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

A plaintiff may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of invidious discriminatory purpose. *Batson v. Kentucky*, 106 S.Ct. at 1721. As well, a person claiming that he has been the victim of intentional discrimination under the Equal Protection Clause may make out a prima facie case by relying solely on the facts concerning the alleged discrimination against him. *Batson*, 106 S.Ct. at 1722. By establishing a prima facie case, the plaintiff creates a rebuttable presumption that the employer unlawfully discriminated. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.E.2d 403 (1983).[1] The guiding prima facie elements which, if established, give rise to an inference of unlawful gender-based discrimination are as follows:

(1) Plaintiff is within a class protected by the equal protection clause;

(2) Plaintiff applied for a job the employer was attempting to fill;

(3) Though qualified, plaintiff was rejected by the employer;

(4) Thereafter, the employer hired or promoted someone ostensibly less qualified and outside the plaintiff's protected class.

*See*, n. 1 and cases cited therein.

Once the plaintiff makes the requisite showing, the burden shifts to the defend-

---

**1.** The Supreme Court's decisions in the context of Title VII (Disparate Treatment) have explained the operation of prima facie burden of proof rules. *See, McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Both the Supreme Court and the United States Court of Appeals for the Fifth Circuit have intimated that the evidentiary evaluation to be performed in Title VII disparate treatment claims and equal protection claims is essentially the same. *See, for example, Batson v. Kentucky*, 106 S.Ct. 1721, n. 19; *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980). Accordingly, the court did and does not hesitate in seeking guidance from the Title VII cases cited above in evaluating the evidence in this case, along with cases dealing specifically with equal protection claims.

ant to explain adequately the gender exclusion. To rebut this presumption, the defendant must clearly set forth the reasons for the plaintiff's rejection. *Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481. In other words, the defendant must produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason. *Id.* at 714, 103 S.Ct. at 1481. The defendant cannot rebut the presumption with mere general assertions that its officials did not discriminate or that they properly performed their official duties. *Batson,* 106 S.Ct. at 1721. Rather, the defendant must demonstrate that permissible gender-neutral selection criteria and procedures produced the complained of result. *Batson, Id.*

Once the defendant has offered evidence to rebut the presumption of impermissible discrimination, the court is in a position to decide the ultimate factual inquiry: whether the defendant intentionally failed to promote or constructively discharged for an impermissible reason. *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1481–82. In other words, the presumption drops from the case, and the court must decide whether the plaintiff has carried the ultimate burden of persuasion. The plaintiff may succeed in carrying the ultimate burden of persuasion either *directly* by persuading the court that a discriminatory reason more likely motivated the employer or *indirectly,* by showing that the employer's preferred explanation is unworthy of credence. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482 (*citing, Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

## FINDINGS OF FACT

1. The Newton County Appraisal District (the "District") is "an appraisal district" within the meaning of Section 6.01 of the Property Tax Code of the State of Texas.

2. The Newton County Appraisal District is a political subdivision of the State of Texas.

3. Mary Lee Cliburn is and has been at all times material herein a member and Chairman and President of the Board of Directors of the District ("the Board").

4. Wanda Thompson is and has been at all times material herein a member of the Board.

5. Geraldine Kerr is and has been at all times material herein a member and Secretary of the Board.

6. In May 1986, the District sought applicants for the position of Chief Appraiser.

7. In an effort to obtain applicants, the District placed an advertisement in several area newspapers, including the May 11, 1986 issue of the *Orange Leader.* The advertisement stated in relevant part that applicants for the position of Chief Appraiser must be registered with the Texas Board of Tax Professional Examiners and hold the designation of registered professional appraiser. The advertisement also stated that two years' experience in the appraisal field or the tax field, or both, was preferred.

8. The District performs appraisal functions and assessing/collecting functions for the taxing units it represents. The Chief Appraiser for the District has duties and responsibilities in both the appraisal and assessing/collecting fields.

9. In May 1986, Herrin was the acting Chief Appraiser for the District, was registered with the Texas Board of Tax Professional Examiners in both the appraisal field and assessing/collecting field, and had completed the following courses approved by the Texas Board of Tax Professional Examiners:

100: Texas Property Tax System (February 1984)

250: Appraisal of Personal Property (February 1984)

325: Property Tax Law (February 1984)

220: Market Approach to Value (June 1984)

120: Introduction to Appraisals (August 1984)

130: Property Tax Collections (April 1985)

230: Income Approach to Value (October 1985)

235: Property Tax Assessment (April 1986)

Herrin had been employed by the District since 1983 and during most of that time had served as the Chief Deputy Appraiser.

10. In May 1986, Herrin possessed over two years' experience in appraisal and tax related fields. She had demonstrated to the satisfaction of her immediate supervisor, the former Chief Appraiser, Linda Crombie, that she possessed the experience, qualifications and ability to handle the position of Chief Appraiser. Ms. Crombie recommended Herrin to the Board for the position of Chief Appraiser.

11. In May 1986, Herrin was thoroughly familiar with the recordkeeping systems and computer equipment utilized in the office of the District.

12. In May 1986, Herrin applied for the position of Chief Appraiser with the District. In May 1986, Herrin met the qualifications stated in the newspaper advertisement and met the registration requirements of the Texas Board of Tax Professional Examiners for the position. Based upon her experience and educational background, she was qualified for the position.

13. The District did not hire Herrin for the position of Chief Appraiser. Instead, the District hired Gerald Cobb ("Cobb") for the position of Chief Appraiser.

14. The District's decision to hire Cobb as Chief Appraiser, and not hire Herrin was based on the majority vote of the Board taken at a special meeting on May 26, 1986. The Board was composed of Cliburn, Thompson, Kerr, Bobbie Myers, and Homer West. Myers and West voted to hire Herrin and are not defendants in this suit. Cliburn, Thompson and Kerr voted to hire Cobb. Interestingly, the sole male on the Board, Homer West, voted to hire Herrin. The Board establishes policy for the District. The Board possessed the authority to hire the Chief Appraiser. The conduct of Cliburn, Thompson and Kerr in hiring Cobb and not hiring Herrin constituted an official act of the District.

15. In May 1986, Cobb did not meet the registration requirements of the Texas Board of Tax Professional Examiners. Cobb had been registered with the Texas Board only from July 14, 1980, to December 31, 1981, and then only in the appraisal field. As of May 1986, Cobb had completed the following courses approved by the Texas Board of Tax Professional Examiners:

100: Texas Property Tax System (September 1980)

120: Introduction to Appraisal (January 1981)

250: Appraisal of Personal Property (May 1981)

300: Appraisal of Agricultural Land (June 1981)

210: Cost Approach to Value (August 1981)

16. At the time the board members of the District decided to place an advertisement in the newspaper setting forth qualifications for the job, Cliburn, Thompson and Kerr did not know that a person could only meet the registration requirements of the Texas Board of Tax Professionals by being actively employed with an appraisal district. The registration requirements reduced the pool of applicants significantly. Had Cliburn, Thompson, and Kerr known that such registration requirements would limit the applicant pool to only persons actively employed in an appraisal district, they would have excluded such registration requirements from the advertisement.

17. On June 20, 1986, after being hired by the District, Cobb registered again with the Texas Board of Tax Professional Examiners, but only in the appraisal field.

18. The fact that Cobb was not *registered* with the Texas Board of Tax Professional Examiners at the time of applying for the position of Chief Appraiser did not in and of itself make him less qualified than Herrin.

19. In May 1986, Cobb had no working knowledge or familiarity with the recordkeeping system and computer equipment utilized in the office of the District. His pre–1983 experience with the tax assessing and collecting system was of limited value

because of major property tax law changes enacted in 1983.

20. After hiring Cobb, the District informed him that his salary as Chief Appraiser would be reduced because he needed additional training to adequately perform his tasks as Chief Appraiser.

21. After hiring Cobb, the District requested Herrin to continue working as Deputy Chief Appraiser for the purpose, *inter alia*, of training Cobb as Chief Appraiser. The Board members advised Herrin that the District would increase her salary to compensate her for the additional responsibility of training Cobb as Chief Appraiser.

22. Following the special meeting of the Board on May 26, 1986, Herrin requested an executive session with defendants for the purpose of obtaining an explanation of why she was not hired for the position of Chief Appraiser.

23. During the executive session, Cliburn, Thompson, and Kerr told Herrin, *inter alia*, that she should stay home with her family; that working outside the home would, in their experience, create problems for Herrin and her family; that Herrin's pregnancy would present problems and complications; that in view of Herrin's current pregnancy, it would be better for all concerned if she were not Chief Appraiser.

24. The various reasons offered at trial by Cliburn, Thompson, and Kerr for not hiring Herrin, even though she was clearly qualified were as follows:

(a) She did not meet the public properly;

(b) She was abrasive with members of the public;

(c) The District was receiving a bad image because of the work done by Herrin;

(d) She was not ready for the job;

(e) Cobb had better intangible qualifications; was better known; was more settled; had wider experience with dealing with persons in the county, such as working in the Tax Appraisal District prior to the changes in Texas Property Tax laws in 1983; had been Vice President of the Allied First National Bank of Newton; had wide experience in other lines of work, including running of what was referred to in testimony as a "filling station"; was older; met the public in a more acceptable way; was more diplomatic in his dealings with the public.

25. In May 1986, Herrin, a female, was pregnant. Cliburn, Thompson and Kerr knew Herrin was pregnant at the time they decided to hire Cobb over Herrin.

26. As to Cliburn's, Thompson's and Kerr's first four reasons for rejecting Herrin, set out above in paragraph 24, subparagraphs (a) through (d), it is this court's considered opinion that such reasons are not credible, and are mere pretexts to avoid liability. As with all findings, the court has carefully weighed all of the evidence, and carefully considered the credibility of all of the witnesses in so finding. The evidence presented at trial of Herrin's customer dealings was hearsay at best, and at worst, was inconsistent with other actions taken by the Board. For example, despite Cliburn's, Thompson's, and Kerr's belief in Herrin's poor customer dealings, they still wanted her to stay on in the very same job, meeting with the very same taxpayers, apparently, in the very same abrasive manner, and at a substantial raise in pay. Moreover, there was stronger, more reliable evidence that Herrin had the strong support of her predecessor, Linda Crombie, thus casting doubt on any contention that Herrin performed her tasks as Deputy Chief Appraiser any less than proficiently. Plus, all three defendants, Cliburn, Thompson, and Kerr, had such "strong evidence" before them when they decided to reject Herrin. Viewing reasons (a) through (d) in their full context, the court finds it more likely that Cliburn, Thompson, and Kerr believed, *inter alia*, (1) that Herrin was not at "the right stage in life"; (2) that Herrin should stay home and raise her children instead of having an aunt do so; (3) that Herrin would likely quit if she were denied the promotion and "asked" to train her future boss; (4) that their true motives could be hidden under the guise they had "personal differences" with Herrin, or that

Herrin lacked certain "intangible qualities."

27. As to the fifth reason for rejecting Herrin set forth above in paragraph 24, sub-paragraph (e), the court finds, after carefully weighing all the evidence, and carefully considering the credibility of all the witnesses, that Herrin's pregnancy was more likely than not the primary motivating factor in Cliburn's, Thompson's, and Kerr's rejection of Herrin, rather than any intangible qualities possessed by Cobb. The court is convinced all three defendant women intentionally considered Herrin's pregnancy in reaching their decisions, and such intentional consideration precipitated their rejection of Herrin, to the extent that if Herrin had not been pregnant, she more likely would have gotten the job in question.

28. On May 28, 1986, Herrin resigned her employment with the District because of the District's discrimination against her and because of the intolerable working environment created by the defendants. Cliburn, Thompson, and Kerr were aware that their decision to hire Cobb, yet ask Herrin to train her very own boss would likely result in Herrin's resignation.

29. Cliburn's, Thompson's, and Kerr's conduct was intentional, willful, and made with wanton disregard of Herrin's rights and privileges.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the equal protection claim pursuant to 28 U.S.C. §§ 1331 and 1343. The court has jurisdiction of the state claim pursuant to its pendant jurisdictional authority. Venue is proper in this District. The defendants have fully answered in this cause and have submitted themselves to the jurisdiction of this court.

2. Herrin's resignation on May 28, 1986, was a "constructive discharge."

3. Defendants' intentional and purposeful decision to not promote Herrin because of her pregnancy denied to her the equal protection of the laws guaranteed to her by the Fourteenth Amendment of the United States Constitution, Section 1. To-wit, it was not the proper role of the District to decide for Herrin whether staying home to raise her children or taking on less job stress was in Herrin's or her children's best interest. Such decisional powers rest exclusively with Herrin. All three defendant women wrongly divested Herrin of such personal, autonomous decision-making powers by imposing upon Herrin in their official capacities their personal views and stereotypes of what jobs and tasks a woman should or should not assume at certain stages in life.

4. Defendants' conduct violated the provisions of Title 42, U.S.C. § 1983.

5. Defendants' conduct violated the provisions of the Commission on Human Rights Act, TEX.LABOR CODE ANN. § 5221K (Vernon 1987).

6. The Findings of Fact articulated in this opinion apply equally to both the federal and state claims now before the court.

7. The conduct of Cliburn, Thompson and Kerr was intentional, willful, and made with wanton disregard of Herrin's rights and privileges.

8. In failing to hire Herrin as Chief Appraiser, Cliburn, Thompson, and Kerr were acting in their official capacities on behalf of the District.

9. Herrin is entitled to recover from Cliburn, Thompson, and Kerr exemplary and punitive damages in the amount of $100 from each defendant.

10. Plaintiff is entitled to recover from the District back pay in the amount of $24,000 per year from the date of constructive discharge to the date of judgment. Additionally, Herrin is entitled to be reinstated as Chief Appraiser as soon as reasonably possible. Defendants have ten (10) days from the signing of the judgment to submit a reinstatement time table. Plaintiff shall then have ten (10) days in which to file a response to defendants' reinstatement timetable.

11. Pursuant to the provisions of Title 42, U.S.C. § 1988, plaintiff is entitled to the recovery of her costs herein, includ-

ing reasonable attorney's fees. Plaintiff shall have ten (10) days from the signing of the judgment to submit her position with respect to costs and reasonable attorney's fees. Defendants shall then have ten (10) days following plaintiff's submission within which to file their position on costs and reasonable attorney's fees.

12. Insofar as any Finding of Fact, *supra*, may be construed as a Conclusion of Law, it is hereby adopted as such.